No. 20-1094

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

BRANDON SODERBERG; BAYNARD WOODS; OPEN JUSTICE BALTIMORE; BALTIMORE ACTION LEGAL TEAM; QIANA JOHNSON; and LIFE AFTER RELEASE,

*Plaintiffs-Appellants*,

v.

HON. AUDREY J.S. CARRION, as Administrative Judge for Maryland's Eighth Judicial Circuit; and HON. SHEILA R. TILLERSON ADAMS, as Administrative Judge for Maryland's Seventh Judicial Circuit,

*Defendants-Appellees*.

On appeal from the U.S. District Court for the District of Maryland
(Civil Action No. 19-1559-RDB)

# BRIEF FOR APPELLANTS

ADAM HOLOFCENER
MARYLAND VOLUNTEER LAWYERS FOR THE ARTS
120 W. North Ave., Suite 305A
Baltimore, MD 21201
Tel.: 410-752-1633
adam@mdvla.org

NICOLAS Y. RILEY
DANIEL B. RICE
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: 202-662-4048
Fax: 202-662-9248
nr537@georgetown.edu
dbr32@georgetown.edu

*March 23, 2020*

*Counsel for Appellants*

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiffs Baltimore Action Legal Team, Open Justice Baltimore, and Life After Release are unincorporated associations with no parent corporations and no stock.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 3

STATEMENT OF THE ISSUE ........ 3

PERTINENT STATUTES AND REGULATIONS ........ 3

STATEMENT OF THE CASE ........ 3

A. The Public's Right of Access to Maryland Court Recordings ........ 3

B. Maryland's Ban on Broadcasting Court Recordings ........ 5

C. Impact of the Broadcasting Ban on Plaintiffs' Speech ........ 6

D. Procedural History ........ 9

SUMMARY OF ARGUMENT ........ 10

STANDARD OF REVIEW ........ 13

ARGUMENT ........ 13

I. Section 1-201 cannot constitutionally be applied to the dissemination of court recordings that Maryland's judiciary has placed in the public domain ........ 13

A. The First Amendment protects the right to disseminate truthful information contained in public court records or disclosed in open court. ........ 14

B. Section 1-201 is not justified by a state interest of the highest order. ........ 19

C. Section 1-201 is not narrowly tailored to ensure fair trials. ........ 22

D. Section 1-201 is not narrowly tailored to protect any other state interests. ........ 30

II. The district court improperly analyzed § 1-201 as a "time, place, and manner" restriction on speech, rather than under *Cox Broadcasting* and *Daily Mail.* ..... 32

A. The district court failed to distinguish *Cox Broadcasting* and *Daily Mail*..... 33

B. Section 1-201 is not a "time, place, and manner" regulation..... 38

C. Even if § 1-201 could be construed as a "time, place, and manner" restriction, it would still violate the First Amendment..... 41

III. The district court's reliance on *Warner Communications* is misplaced..... 43

CONCLUSION ..... 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM A: Pertinent Maryland Statutes & Rules

ADDENDUM B: Public Access to Trial-Court Recordings in Other States

## TABLE OF AUTHORITIES

**Page**

**Cases**

*ACLU v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......... 43

*American Legion Post 7 v. City of Durham*,
239 F.3d 601 (4th Cir. 2001) .......... 41

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) .......... 13, 19

*Bowley v. City of Uniontown Police Dep't*,
404 F.3d 783 (3d Cir. 2005) .......... 23

*Chandler v. Florida*,
449 U.S. 560 (1981) .......... 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .......... 23

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .......... 42

*Commonwealth v. Barnes*,
461 Mass. 644 (2012) .......... 35, 36

*Cooper v. Dillon*,
403 F.3d 1208 (11th Cir. 2005) .......... 23

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975) .......... passim

*Craig v. Harney*,
331 U.S. 367 (1947) .......... 1

*Fields v. City of Philadelphia*,
862 F.3d 353 (3d Cir. 2017) .......... 43

*Firearms Policy Coal. Second Amendment Def. Comm. v. Harris*,
192 F. Supp. 3d 1120 (E.D. Cal. 2016) .......... 23, 34-35

*Florida Star v. B.J.F.*,
491 U.S. 524 (1989) .......... passim

*Gambale v. Deutsche Bank AG*,
377 F.3d 133 (2d Cir. 2004) .................... 45-46

*Gates v. Discovery Commc'ns, Inc.*,
101 P.3d 552 (Cal. 2004) .................... 24

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) .................... 45

*In re Charlotte Observer*,
882 F.2d 850 (4th Cir. 1989) .................... 26

*In re Charlotte Observer*,
921 F.2d 47 (4th Cir. 1990) .................... 45

*In re Murphy-Brown*,
907 F.3d 788 (4th Cir. 2018) .................... 26

*In re Washington Post Co.*,
807 F.2d 383 (4th Cir. 1986) .................... 21

*Indus. Found. of the South v. Tex. Indus. Accident Bd.*,
540 S.W.2d 668 (Tex. 1976) .................... 24

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .................... 45

*KPNX Broad. v. Superior Court of Maricopa Cty.*,
139 Ariz. 246 (1984) .................... 34, 35

*Landmark Commc'ns, Inc. v. Virginia*,
435 U.S. 829 (1978) .................... 15, 30

*Linmark Assocs., Inc. v. Willingboro Township*,
431 U.S. 85 (1977) .................... 42, 43

*Matter of Search Warrant Application*,
923 F.2d 324 (4th Cir. 1991) .................... 26

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................... 41

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976) .................... 15, 20

*Nixon v. Warner Communications, Inc.*,
435 U.S. 589 (1978) .......... 12, 43, 44

*Oklahoma Publishing Co. v. District Court*,
430 U.S. 308 (1977) .......... 15, 20, 21

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) .......... 24

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) .......... 42

*Ray v. Roane*,
948 F.3d 222 (4th Cir. 2020) .......... 13

*Sheehan v. Gregoire*,
272 F. Supp. 2d 1135 (W.D. Wash. 2003) .......... 24

*Sheppard v. Maxwell*,
384 U.S. 333 (1966) .......... 14

*Skilling v. United States*,
561 U.S. 358 (2010) .......... 37

*Smith v. Daily Mail Publishing Co.*,
443 U.S. 97 (1979) .......... passim

*State v. Syed*,
460 Md. 3 (2018) .......... 28

*State v. Syed*,
463 Md. 60 (2019) .......... 29

*United States v. Berger*,
990 F. Supp. 1054 (C.D. Ill. 1998) .......... 40

*United States v. Kerley*,
753 F.2d 617 (7th Cir. 1985) .......... 39, 40

*Washington Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) .......... 19

**Other Authorities**

MD. COURT OF APPEALS, WEBCAST ARCHIVE, 2018 TERM .......... 29

Orin Kerr (@OrinKerr), TWITTER (Oct. 27, 2017, 10:21 AM) .......... 40

ADMIN. OFFICE U.S. COURTS, *Digital Audio Recording Project* .......... 22

**Rules**

Ariz. Sup. Ct. R. 122(h) .......... 22

Conn. R. Super. Ct., Gen. Provisions, § 1-11C(a) .......... 22

Fla. R. Jud. Admin. 2.450(a) .......... 22

Fed. R. Crim. P. 53 .......... passim

Mass. Sup. Jud. Ct. 1:19(2) .......... 22

Md. Code, Crim. Proc. § 1-201 .......... 5, 27, 31

Md. Code, Cts. & Jud. Proc. § 12-302 .......... 28

Md. Rule 16-504 .......... passim

Mich. Sup. Ct. Admin. Order 1989-1(2)(a)(i) .......... 22

Miss. R. for Elec. and Photographic Coverage of Jud. Proceedings 3 .......... 22

N.C. R. Super. & Dist. Cts. 15(b) .......... 22

N.H. R. Crim. P. 46(a) .......... 22

N.M. Sup. Ct. R. 23-107 .......... 22

Ohio R. of Superintendence for Cts. 12(A) .......... 22

R.I. R. Sup. Ct., art. vii .......... 22

S.C. R. App. Ct. 605(f)(1)(i) .......... 22

Tenn. Sup. Ct. R. 30(A)(1) .......... 22

Utah Jud. Admin. Code, Rule 4-401.01(2) .......... 22

Vt. R. Crim. P. 53 .......... 22

Wis. Sup. Ct. R., ch. 61 .......... 22

**Constitutional Provisions**

U.S. Const. amend. VI ........................................................................................................ 21

# INTRODUCTION

In recent years, Maryland court officials have threatened to hold several journalists in contempt for using recordings of state-court proceedings in podcasts and documentaries. The journalists were not accused of publicly disclosing any confidential information about the proceedings. Nor were they accused of obtaining the recordings illegally. In fact, all of the recordings had previously been made public by the court itself (in some cases, years earlier). Instead, the journalists were accused of violating a controversial Maryland law that bars people from "broadcast[ing]" any recording of any criminal proceeding—even when the State itself placed the recording in the public domain.

This lawsuit challenges the validity of that law. The suit rests on a simple but important principle, firmly rooted in longstanding Supreme Court precedent: that "the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975); *see also Craig v. Harney*, 331 U.S. 367, 374 (1947) ("If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt.").

Plaintiffs are journalists and community organizations who possess recordings of several Maryland criminal hearings and trials. They want to use those recordings—all of which they obtained lawfully and all of which remain freely accessible at state courthouses—to engage in public discourse about their local court systems. Although

they would use the recordings in different ways—some for journalistic ends, some for civic education, and some for political advocacy—all Plaintiffs hope to use the recordings to advance a common goal: promoting greater democratic accountability within Maryland's criminal justice system. They brought this suit because Maryland law precludes them from doing just that.

The district court dismissed this case because it considered Maryland's broadcasting ban no different from restrictions on courtroom broadcasting (like Federal Rule of Criminal Procedure 53) that other courts have upheld as valid "time, place, and manner" regulations. In reaching that conclusion, however, the district court overlooked a key difference between Maryland's broadcasting ban and the restrictions upheld in those other cases: namely, that Maryland's ban applies to the use of recordings that the *court itself* chose to make public. Critically, Plaintiffs do not challenge Maryland's ban insofar as it prohibits broadcasting *inside the courtroom* (like Rule 53). They challenge the ban only insofar as it prohibits them from disseminating recordings that Maryland itself has placed in the public domain. The district court's decision disregards that critical distinction.

More importantly, the district court failed to heed the Supreme Court's repeated admonition that "States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Cox Broadcasting*, 420 U.S. at 495. As explained below, that straightforward rule governs the outcome of this case and mandates reversal of the district court's ruling.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's original jurisdiction under 28 U.S.C. § 1331. Joint Appendix (JA) 11. On January 14, 2020, the district court dismissed Plaintiffs' complaint and entered final judgment in favor of all Defendants. JA 93. Plaintiffs filed a timely notice of appeal on January 27. JA 94; Fed. R. App. P. 4(a). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Section 1-201 of Maryland's Code of Criminal Procedure provides, in relevant part, that "a person may not record or broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court." The question presented in this appeal is whether § 1-201—as applied to the broadcast of recordings lawfully obtained from Maryland court officials—violates the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE[1]

### A. The Public's Right of Access to Maryland Court Recordings

In Maryland, most proceedings held before a trial judge are electronically recorded. JA 11 (Complaint). Almost every jurisdiction creates audio recordings of

[1] The following facts are derived from Plaintiffs' complaint. Citations to the Joint Appendix appear as "JA __." Citations to district-court filings appear as "Dist. Ct. ECF No. __," followed by the relevant page number.

its proceedings and some, like Baltimore City, create video recordings, as well. JA 11-12.

For nearly two decades, members of the public have been able to view, listen to, and obtain copies of Maryland trial-court recordings. The public's right of access to these recordings is currently governed by Maryland Rule 16-504, which was adopted by the Maryland Court of Appeals. That rule requires court officials to "make a copy" of any audio recording "available to any person upon written request." Md. Rule 16-504(h) ("Right to Obtain Copy of Audio Recording"). The rule also requires court officials to let "any person" view and listen to any audio and video recordings at the courthouse, in person. *See* Md. Rule 16-504(i) ("Right to Listen to and View Audio-video Recording"). Court officials have the discretion to designate specific "time[s] and place[s]" for viewing the recordings, *id.*, and to charge people for the "reasonable costs" of making copies of the recordings, Md. Rule 16-504(h)(1). The procedures for viewing or requesting copies of the recordings vary from courthouse to courthouse.

Rule 16-504 also contains two mechanisms for ensuring that especially sensitive content will not be released to the public. First, if a judge finds that certain portions of a recording "should and lawfully may be shielded from public access and inspection, the court shall direct that appropriate safeguards be placed on that portion of the recording." Md. Rule 16-504(g). And second, recordings may be withheld

from the public as "ordered by the court" in specific cases where it is warranted by law. *See* Md. Rule 16-504(h)(1)(C), (i)(1).

### B. Maryland's Ban on Broadcasting Court Recordings

Despite Maryland's policy of making its trial-court recordings available to the public, Maryland law restricts the public's ability to disseminate those recordings. Specifically, § 1-201 of Maryland's Code of Criminal Procedure provides that "a person may not record or broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury." Md. Code, Crim. Proc. § 1-201(a)(1).

"A person who violates this section may be held in contempt of court." *Id.* § 1-201(c). The statute does not specify whether violations of § 1-201 are punishable by civil contempt or criminal contempt. However, court officials have taken the position that, "[i]n both criminal and civil contempt proceedings, a full range of sanctions, including incarceration, may apply." Dist. Ct. ECF No. 21-1 (Defendants' Motion to Dismiss), at 33.

Critically, Maryland court officials construe § 1-201 to prohibit both *live* broadcasts of court proceedings and broadcasts of any previously made court *recordings*—including recordings that the judiciary itself has made available to the public. *See* JA 19. In 2016, for example, Baltimore court officials considered holding in contempt the producers of *Serial*, a popular investigative-reporting podcast, for playing excerpts of a 2000 murder trial on their show. JA 19. Last year, a Baltimore

City circuit judge sent a letter to HBO admonishing the network for using video footage of the same trial in a documentary. JA 19, 53. And, one month after sending the letter to HBO, the same judge sent a similar letter to a local journalist warning her that it would be unlawful for her to include courtroom audio (from a different case) on her podcast. JA 19, 54-55.

### C. Impact of the Broadcasting Ban on Plaintiffs' Speech

Plaintiffs are journalists, lawyers, and community organizations who seek to publish and disseminate recordings of Maryland criminal proceedings as part of their reporting, advocacy, and community-education efforts. They have refrained from doing so, however, because they fear being sanctioned under § 1-201.

Plaintiffs Brandon Soderberg and Baynard Woods are Baltimore-based journalists whose work has been published in local and national outlets, including the *New York Times* and the *Washington Post*. JA 16. They are working on a book and a documentary film about the Baltimore Police Department's Gun Trace Task Force, a now-defunct unit whose former members are all currently serving federal prison sentences for corruption and racketeering. JA 16. Over the past few years, the Baltimore City Court Reporter's office has provided Mr. Soderberg and Mr. Woods with copies of several audio recordings, as well as a video recording, from criminal cases in which members of the Gun Trace Task Force testified. JA 16. Mr. Soderberg and Mr. Woods intend to use these recordings in their documentary film, among other reporting projects. JA 16.

Plaintiffs Open Justice Baltimore (OJB) and the Baltimore Action Legal Team (BALT) are organizations that support community-centered efforts to improve the criminal justice system, including by enhancing its transparency. JA 16-17. Like Mr. Soderberg and Mr. Woods, OJB and BALT have both lawfully obtained audio recordings of court proceedings from the Baltimore City Court Reporter's office. JA 17. They intend to use these recordings to educate the public about Baltimore's legal system and advocate for reform. JA 17. In particular, OJB and BALT plan to post the recordings online, play them at community events (including know-your-rights events for community members and legal training for volunteer lawyers), share them on social media, and potentially include them on podcasts. JA 17.

Plaintiff Qiana Johnson is a community organizer in Prince George's County and the founder of Plaintiff Life After Release, an organization that seeks to empower people and communities affected by the criminal justice system. JA 17. Life After Release coordinates a court-watching program aimed at promoting accountability within Prince George's County's judicial system. JA 17. The organization also supports people facing criminal charges by helping their families and community members remain informed and involved in the adjudicative process. JA 17. Ms. Johnson and Life After Release have lawfully obtained audio recordings of local court proceedings from the Prince George's County Office of Court Reporters. JA 17. The recordings come from proceedings in which Ms. Johnson was invited to address the court on behalf of criminal defendants who asked her to advocate for them. JA 17.

Ms. Johnson and Life After Release plan to post the recordings on their websites and play them at meetings in order to highlight the impact of their participatory-defense work and teach others how to become effective community advocates. JA 18.

In May 2019, Mr. Soderberg, Mr. Woods, OJB, and BALT (the Baltimore Plaintiffs) submitted letters to Baltimore City's administrative judge, Hon. W. Michel Pierson, to notify him of their plans to disseminate the recordings in their possession. *See* JA 32-33, 35-36. In the letters, the Baltimore Plaintiffs asked if Judge Pierson knew of any harms that might result from the dissemination of the recordings, noting that they would consider his views before acting on their plans. JA 20. The Baltimore Plaintiffs also sought clarity as to whether their intended uses of the recordings—such as sharing them on social media—would constitute "broadcasting" under § 1-201. JA 20. Court officials never responded to either letter, or to a follow-up email from Plaintiffs' counsel three weeks later. JA 20.

Two weeks after the Baltimore Plaintiffs wrote to Judge Pierson, Ms. Johnson and Life After Release (the Prince George's County Plaintiffs) submitted a similar letter to the administrative judge for Prince George's County, Hon. Sheila R. Tillerson Adams. JA 39-41. Like Judge Pierson, Judge Tillerson Adams never responded to the letter from the Prince George's County Plaintiffs or to a follow-up inquiry one week later. JA 21-22.

Court officials' failure to respond to Plaintiffs' repeated inquiries has left Plaintiffs in the dark as to whether (and, if so, how) they may disseminate the various

court recordings in their possession. More importantly, it has chilled their speech and deterred them from using the recordings in all of the ways that they otherwise would. JA 15, 18-19.

### D. Procedural History

On May 28, 2019, Plaintiffs filed this declaratory-judgment action against Judges Pierson and Tillerson Adams, as well as against the Baltimore City and Prince George's County court reporters (in their roles as official custodians of court recordings for those jurisdictions).[2] In their complaint, Plaintiffs asserted that § 1-201 violates the First Amendment and is void for vagueness. JA 23-30. They sought a declaratory judgment that § 1-201 is unconstitutional insofar as it prohibits Plaintiffs from disseminating court recordings that they acquired through lawful means. JA 29-30.

Defendants moved to dismiss the complaint in July 2019. Dist. Ct. ECF No. 21-1. Specifically, they argued that Plaintiffs lacked standing and that the complaint failed to state a claim and failed to name necessary parties.

The district court dismissed the complaint in January 2020, without a hearing. JA 93 (Order of Dismissal). The court rejected Defendants' argument that Plaintiffs lacked standing, JA 65-73, and also rejected Defendants' argument that the complaint

---

[2] After this suit was filed, Judge Pierson retired from his position as Baltimore City's administrative judge. His replacement, Hon. Audrey J.S. Carrion, has been substituted as a Defendant in this suit.

failed to name necessary parties, JA 75-78. The court held, however, that Plaintiffs had failed to state a claim under either the First Amendment or the void-for-vagueness doctrine. JA 78-92. The court also held that the court reporters were not proper Defendants. JA 73-75.

Plaintiffs timely appealed the dismissal of their First Amendment claim against Judges Pierson and Tillerson Adams. JA 94.

## SUMMARY OF ARGUMENT

It is important, at the outset, to identify the specific First Amendment right at issue in this case. Plaintiffs are not asserting an unfettered right to broadcast every criminal proceeding that takes place in a Maryland trial court. Nor do they claim the right to copy every court recording produced by Maryland's judiciary. Instead, Plaintiffs are asserting a more modest right: namely, the right to disseminate material that Maryland court officials have placed in the public domain. Plaintiffs challenge § 1-201 of Maryland's Code of Criminal Procedure only insofar as it infringes that right.

**I.** In *Cox Broadcasting v. Cohn*, the Supreme Court held that "the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." 420 U.S. 469, 496 (1975). That basic principle precludes Maryland from punishing Plaintiffs for broadcasting official court recordings that Maryland's own court officials chose to

distribute to the public (and continue to make available for public viewing and listening at state courthouses).

Subsequent case law only reaffirms that conclusion. In *Smith v. Daily Mail Publishing Co.*, the Supreme Court held that when someone "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." 443 U.S. 97, 103 (1979). Courts have relied on that rule in numerous cases to invalidate state efforts to ban the broadcast or publication of lawfully obtained materials—even when the materials were highly sensitive and the government released them inadvertently. This case presents an even easier application of the *Daily Mail* rule: after all, the materials at issue consist of recordings that document *public* events—proceedings held in open court—and court officials *chose* to release them voluntarily.

Defendants cannot identify a "state interest of the highest order" to justify § 1-201's ban on broadcasting those recordings. Although Defendants claim that § 1-201 safeguards the fair-trial rights of the accused, they have provided little more than speculative hypotheticals to explain how a ban on broadcasting *already-public* court recordings promotes trial fairness. Furthermore, they cannot explain why their stated objectives could not be achieved through any number of less speech-restrictive measures, including, most obviously, limiting public access to court recordings in the first place. *Daily Mail* mandates that any restrictions on the dissemination of lawfully

acquired, truthful information be narrowly tailored. Maryland's blanket ban on broadcasting recordings—in all cases, for all proceedings, in perpetuity—falls well short of that standard.

**II.** The district court refused to apply *Cox Broadcasting* and *Daily Mail* because it read those cases to apply only to *complete* bans on the publication of truthful information. In the district court's view, § 1-201 does not impose such a ban because it does not *completely* preclude people from publishing information about criminal cases; it merely bars them from broadcasting recordings of those proceedings. Thus, rather than applying the *Daily Mail* rule, the court held that § 1-201 should be analyzed—and upheld—under the more forgiving test for regulations of the "time, place, and manner" of speech.

The district court's reasoning cannot be squared with numerous cases applying the *Daily Mail* rule—including *Daily Mail* itself. As those cases make clear, state efforts to impose even *partial* bans on the dissemination of lawfully obtained, truthful information are subject to strict scrutiny, rather than the "time, place, and manner" test the district court applied. And, even if § 1-201 were properly construed as a "time, place, and manner" regulation—which it is not—the statute would still be unconstitutional under that standard.

**III.** In addition to upholding § 1-201 as a valid "time, place, and manner" regulation, the district court also held that Plaintiffs' First Amendment claim was foreclosed by the Supreme Court's decision in *Nixon v. Warner Communications, Inc.*,

435 U.S. 589 (1978). In that case, the Supreme Court held that the press had no First Amendment right to obtain copies of audio recordings that had been played as evidence during a criminal trial. That decision has no application here, however, because Plaintiffs are not seeking to obtain copies of any recordings. Rather, they are seeking to *disseminate* recordings that they already have in their possession. Contrary to the district court's decision, *Warner Communications* does not speak to that right, let alone foreclose it.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of a motion to dismiss *de novo*." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). "In reviewing a motion to dismiss for failure to state a claim, [this Court] must 'accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Id.* (citation omitted).

## ARGUMENT

### I. Section 1-201 cannot constitutionally be applied to the dissemination of court recordings that Maryland's judiciary has placed in the public domain.

"As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). That principle carries its greatest weight when the information to be published is derived from a public source, such as court records. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975) ("Once true information is

disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.”). For that reason, courts have held that governmental efforts to restrict the dissemination of such information must be narrowly tailored to satisfy a state interest of the highest order. As explained below, Maryland cannot satisfy that standard here.

### A. The First Amendment protects the right to disseminate truthful information contained in public court records or disclosed in open court.

“The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.” *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). In recognition of that key democratic function, the Supreme Court has repeatedly invalidated state efforts to restrict the dissemination of truthful information contained in publicly available court records or disclosed in open court.

In *Cox Broadcasting Corp. v. Cohn*, the Court held that a television station could not be subject to tort liability for broadcasting the name of a teenage rape victim whose identity had been disclosed in a publicly filed indictment. 420 U.S. at 496-97. The victim’s father sued the station for invasion of privacy under Georgia law after the station identified the victim in a report covering the trial of one of her attackers. *Id.* at 471-74. In holding that the First Amendment shielded the station from liability, the Supreme Court emphasized the fact that the station had learned the victim’s name from public court records. The Court reasoned:

> Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.

*Id.* at 495. The Court thus concluded that the First Amendment "command[s] nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Id.*; *see also id.* at 496 ("[T]he First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records.").

In the years following *Cox Broadcasting*, the Court built upon this principle in striking down other efforts by state officials to limit the dissemination of information about public court proceedings. *See, e.g.*, *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 311-12 (1977) (per curiam) (invalidating a state-court order barring the press from publishing the name and photo of a juvenile defendant who had been tried in open court); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (invalidating a state-court order barring the press from reporting on evidence disclosed in open court during criminal pretrial proceedings); *see also Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839-42 (1978) (holding that a newspaper could not be punished for publishing information leaked to the press about confidential proceedings of a state's judicial-oversight commission).

The Court eventually distilled the reasoning of these decisions into a simple rule in *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979).[3] Under that rule, if a member of the press or the public "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id.* at 103 (striking down state law making it a crime for any newspaper to publish the name of a youthful offender).

The Court's application of that rule in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989), is instructive here. In *Florida Star*, the Court considered whether a newspaper could be held liable in tort for publishing the name of a sexual-assault victim whose identity had been inadvertently made public by the police. *Id.* at 526-27. The newspaper had obtained the name from an incident report housed in the press room of a local police precinct. *Id.* at 527. Relying on *Daily Mail*, the Court held that the First Amendment shielded the newspaper from liability because it had obtained the victim's name lawfully and no "state interest of the highest order" justified the statute's ban on publication. *Id.* at 541.

---

[3] Although some of the cases that served as the foundation for the *Daily Mail* rule involved prior restraints on the dissemination of publicly available information, the Court made clear in *Daily Mail* that the "prior restraint" label was not a dispositive factor. *See* 443 U.S. at 101 ("The resolution of this case does not turn on whether the [challenged statute] is, in and of itself, a prior restraint."). As the Court explained: "Whether we view the statute as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful information is not dispositive because even the latter action requires the highest form of state interest to sustain its validity." *Id.* at 101-02.

In reaching that conclusion, the Court identified "three separate considerations" underlying the *Daily Mail* rule. 491 U.S. at 533. First, the Court noted, "because the *Daily Mail* formulation only protects the publication of information which a newspaper has 'lawfully obtain[ed],' the government retains ample means of safeguarding significant interests upon which publication may impinge." *Id.* at 534 (alteration in original); *see also id.* (noting the availability of other safeguards against situations "where the government's mishandling of sensitive information leads to its dissemination"). Second, the Court observed, "punishing the press for its dissemination of information which is *already publicly available* is relatively unlikely to advance the interests in the service of which the State seeks to act." *Id.* at 535 (emphasis added). Finally, the Court highlighted "the 'timidity and self-censorship' which may result from allowing the media to be punished for publishing certain truthful information." *Id.* (citation omitted). Taken together, the Court explained, these considerations showcased the logic of the *Daily Mail* rule. Thus, the Court concluded, "where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." *Florida Star*, 491 U.S. at 541.

*Florida Star* makes clear that the *Daily Mail* rule applies to *any* lawfully obtained, truthful information—not just information about judicial proceedings. But the decision also reaffirmed that the rule applies most clearly to information "obtained from courthouse records . . . open to public inspection." 491 U.S. at 532. Indeed, the

Court cited *Cox Broadcasting*'s emphasis on the "special protected nature of accurate reports of *judicial* proceedings" to explain why *Cox Broadcasting* did not directly govern the situation before it in *Florida Star* (which involved a police record rather than a court record). 491 U.S. at 532 (quoting 420 U.S. at 492). And the Court repeatedly highlighted "the important role the press plays in subjecting *trials* to public scrutiny and thereby helping guarantee their fairness." *Id.* (emphasis added); *see also id.* ("That role is not directly compromised where, as here, the information in question comes from a police report prepared and disseminated [before] adversarial criminal proceedings [have] begun."). In short, *Florida Star* left no doubt that the dissemination of "courthouse records . . . open to public inspection" is entitled to the highest level of First Amendment protection. *Id.*

The recordings at issue in this case fall squarely within the category of "courthouse records . . . open to public inspection." *Florida Star*, 491 U.S. at 532. All of the recordings were created and distributed by the courts pursuant to official court policies, and copies of the same recordings remain available for public viewing, listening, and purchase at state courthouses. *See* JA 11-12; Md. Rule 16-504(h), (i). Those facts alone preclude Defendants, under *Cox Broadcasting*, from punishing Plaintiffs for disseminating them. *See* 420 U.S. at 496 ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it."). And even if *Cox Broadcasting* were not directly on point here, Plaintiffs' efforts to disseminate those recordings would still be entitled to (at

least) the same level of First Amendment protection as the press's efforts in *Daily Mail*, *Florida Star*, and similar cases.

### B. Section 1-201 is not justified by a state interest of the highest order.

Defendants bear a heavy burden in seeking to justify § 1-201's ban on broadcasting court recordings that Maryland itself has chosen to make public. Specifically, they must show that the ban is necessary to serve a "state interest of the highest order." *Daily Mail*, 443 U.S. at 103. To satisfy that requirement, the justification for the ban must consist of something "far stronger than mere speculation about serious harms." *Bartnicki*, 532 U.S. at 532 (citation omitted). Rather, it must reflect a concrete need to prevent real harm. *See Washington Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019) ("The First Amendment does not permit states to broadly conjure hypotheticals in support of expressive burdens.").

The primary justification that Defendants (and the district court) have identified for § 1-201 is "the State's vital interest in ensuring fair criminal trials." JA 78. In particular, Defendants fear that allowing broadcast coverage of criminal proceedings could sensationalize the proceedings and prejudice jurors' views. But these generalized fair-trial concerns are not weighty enough to justify a blanket ban on the broadcast of *all* criminal proceedings. *See Chandler v. Florida*, 449 U.S. 560, 574-75 (1981) ("An absolute constitutional ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast

accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter.”). And they certainly are not sufficient to ban the dissemination of information that has already been made public. *See Florida Star*, 491 U.S. at 535 (“[I]t is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release.”).

Indeed, the Supreme Court has explicitly held that trial-fairness concerns are not sufficient to justify restrictions on the dissemination of truthful information about criminal cases. For instance, in *Nebraska Press Association*, the Court roundly rejected the argument that a criminal defendant’s due-process rights justified a pretrial order barring the press from “publishing or broadcasting” information about evidence disclosed at pretrial hearings. *See* 427 U.S. at 541, 570. Although the Court acknowledged the importance of safeguarding the defendant’s right to a fair trial, it held that “prohibiting reporting or commentary on judicial proceedings held in public” was “clearly invalid.” *Id.* at 570; *see also id.* at 565 (“[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial.”).

Similarly, in *Oklahoma Publishing Co.*, the Court held that a state trial judge could not prohibit the press from publishing the name and photograph of a juvenile defendant whose trial had occurred in open court. 430 U.S. at 311-12. The Court did not dispute that the state had a valid interest in protecting the juvenile’s identity, and it

even acknowledged that state law favored closed trials for juvenile cases. *See id.* at 309-10. Nevertheless, because the judge had declined to close the courtroom during the trial, the Court concluded, the First Amendment did "not permit a state court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact open to the public." *Id.* at 310.

The outcomes of these cases are not surprising. After all, the notion that public scrutiny of the judicial process would *undermine*—rather than enhance—the fairness of criminal trials inverts the very constitutional interests that *Cox Broadcasting*, *Daily Mail*, and their progeny aim to protect. One of the main reasons the government cannot prohibit the press from publishing information contained in court records is because of "the important role the press plays in subjecting trials to public scrutiny and thereby helping guarantee their fairness." *Florida Star*, 491 U.S. at 532 (emphasis added); *cf. In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986) ("[P]ublic access [to court proceedings] serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or wrongful conduct."). The Constitution itself recognizes as much by guaranteeing the "right to a . . . *public* trial." U.S. Const. amend. VI (emphasis added). Defendants' contention that § 1-201 is needed to ensure fair criminal trials, therefore, gets the logic of *Cox Broadcasting* and *Daily Mail* exactly backwards.

Defendants' fair-trial concerns also cannot be squared with the longstanding practices of numerous other jurisdictions. Many state and federal trial courts make

recordings of criminal proceedings available to the public, without imposing any restrictions on the subsequent dissemination of those recordings.[4] And many states similarly allow members of the press or the public to make their own recordings of criminal trial-court proceedings (subject to certain limitations).[5] None of those courts appears to have suffered any great harm (reputational or otherwise) from allowing those recordings to be freely shared. It is unlikely that Maryland—which appears to be the only jurisdiction to ban the broadcast of *publicly available* court recordings—has a unique interest in shielding its public recordings from broader scrutiny or exposure.

**C. Section 1-201 is not narrowly tailored to ensure fair trials.**

Even if Defendants could identify a concrete basis for banning the dissemination of publicly available court recordings, they still cannot show that the

[4] For example, members of the public may obtain recordings from almost any (public) criminal proceeding held in the primary state trial courts of Alaska, Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, North Dakota, Vermont, Utah, and Wisconsin. *See* Addendum B (providing a non-exhaustive list of state and local jurisdictions that allow the public to access such recordings). Dozens of federal district courts likewise make audio recordings of all of their proceedings (including criminal proceedings) available to the public through PACER. *See, e.g.*, ADMIN. OFFICE U.S. COURTS, *Digital Audio Recording Project* (last accessed Mar. 20, 2020), https://perma.cc/9ZSV-P4JR.

[5] *See, e.g.*, Ariz. Sup. Ct. R. 122(h); Conn. R. Super. Ct., Gen. Provisions, § 1-11C(a); Fla. R. Jud. Admin. 2.450(a); Mass. Sup. Jud. Ct. 1:19(2); Mich. Sup. Ct. Admin. Order 1989-1(2)(a)(i); Miss. R. for Elec. and Photographic Coverage of Jud. Proceedings 3; N.H. R. Crim. P. 46(a); N.M. Sup. Ct. R. 23-107; N.C. R. Super. & Dist. Cts. 15(b); Ohio R. of Superintendence for Cts. 12(A); R.I. R. Sup. Ct., art. vii; S.C. R. App. Ct. 605(f)(1)(i); Tenn. Sup. Ct. R. 30(A)(1); Utah Jud. Admin. Code, Rule 4-401.01(2); Vt. R. Crim. P. 53; Wis. Sup. Ct. R., ch. 61.

ban is necessary to achieve their stated objectives. As noted above, restrictions on the dissemination of lawfully obtained, truthful information must be "*narrowly tailored* to a state interest of the highest order." *Florida Star*, 491 U.S. at 541 (emphasis added); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (characterizing *Florida Star* test as a "strict scrutiny" analysis). Section 1-201 does not satisfy that requirement.

As an initial matter, § 1-201's ban on disseminating court recordings cannot be narrowly tailored because Maryland itself willingly makes those same recordings available to the public. *Florida Star* makes clear that when "the government has failed to police itself in disseminating information, . . . the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding [the state's asserted interest]." 491 U.S. at 538. "Indeed, when the government has stewardship over confidential information, not releasing the information to the media in the first place will more narrowly serve the interest of preserving confidentiality than will punishing the publication of the information once inappropriately released." *Bowley v. City of Uniontown Police Dep't*, 404 F.3d 783, 788 (3d Cir. 2005).[6]

[6] *Accord Cooper v. Dillon*, 403 F.3d 1208, 1218 (11th Cir. 2005) ("[T]he onus is on the state to keep matters confidential if they do not want them to be disseminated." (citing *Cox Broadcasting*, 420 U.S. at 496)); *Firearms Policy Coal. Second Amendment Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1129 (E.D. Cal. 2016) ("[T]he State's decision to make information publicly available necessarily means that further

This Court relied on similar reasoning in *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010). In that case, the Court enjoined Virginia officials from prosecuting a woman who knowingly posted to her website documents containing thousands of social security numbers because she had obtained the documents from various county clerks' websites. *Id.* at 268-69. The Court's decision rested on the same precedents that the Supreme Court relied on in *Florida Star*. As the Court reasoned, "*Cox Broadcasting* and its progeny indicate that punishing truthful publication of private information will almost never be narrowly tailored to safeguard privacy when the government itself released that information to the press." *Id.* at 280.

The logic underlying both *Florida Star* and *Ostergren* applies even more strongly in the present case. In both *Florida Star* and *Ostergren*, the information at issue was highly sensitive and the state's disclosure of the information was inadvertent. *See Ostergren*, 615 F.3d at 280 ("Even where disclosure to the press was accidental, *Florida*

---

dissemination of that information advances the public's interest in good government."); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1147 (W.D. Wash. 2003) ("[W]hen the government itself injects . . . information into the public domain, it cannot credibly take the contradictory position that one who compiles and communicates that information offends a compelling state interest."); *Gates v. Discovery Commc'ns, Inc.*, 101 P.3d 552, 562 (Cal. 2004) ("We, like the high court, are 'reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man.'" (quoting *Cox Broadcasting*, 420 U.S. at 496)); *Indus. Found. of the South v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 684 (Tex. 1976) (refusing to allow the government to "impos[e] sanctions on those who would publicize such matters to which they have a right of access").

*Star* indicates that the press cannot be prevented from publishing the private information."). Here, in contrast, the recordings at issue not only document events that took place in *open* court but also were *deliberately* made public by Maryland's own judiciary.[7] Under these circumstances, the ban on broadcasting those recordings cannot plausibly be characterized as narrowly tailored. *Cf. Cox Broadcasting*, 420 U.S. at 495 ("By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served.").

The conflict between § 1-201 and Maryland's policy of publicly distributing court recordings is not the only evidence of the statute's lack of tailoring. The statute also—on its face—sweeps much more broadly than necessary to achieve Defendants' stated objectives. Defendants claimed below that the statute serves to safeguard the fair-trial rights of the accused. But § 1-201, by its own terms, applies to recordings from "any" criminal proceeding—regardless of when the proceeding occurred, who participated, and what transpired. The statute applies equally to pending cases and cases that ended years ago; to high-profile matters and obscure ones; to lengthy jury

[7] *See* JA 16-17 (describing how court officials provided Plaintiffs with copies of court recordings); Md. Rule 16-504(h) (providing that "the authorized custodian of an audio recording shall make a copy of the audio recording or, if practicable, the audio portion of an audio-video recording, available to any person upon written request"); Md. Rule 16-504(i) (providing that "the authorized custodian of an audio-video recording, upon written request from any person, shall permit the person to listen to and view the recording at a time and place designated by the court").

trials with numerous witnesses and brief status conferences with no witnesses. In short, the statute draws no distinction between the types of court recordings whose dissemination might impact a defendant's trial and those that surely will not. *Cf. In re Murphy-Brown*, 907 F.3d 788, 799-800 (4th Cir. 2018) (holding that a "gag order was not narrowly tailored" to ensure trial fairness where it "applied blanket restrictions to more than twenty cases that will be tried over a period of years" and "assumed all covered individuals were identically situated vis-à-vis pending and future litigation").

Not surprisingly, Maryland courts have at their disposal several less restrictive alternatives for protecting against any potential risks associated with extensive trial publicity. *See generally Matter of Search Warrant Application*, 923 F.2d 324, 329 (4th Cir. 1991) ("The reason that fair trials can coexist with media coverage is because there are ways to minimize prejudice to defendants without withholding information from public view."). The most obvious alternative is *voir dire*, which is "the preferred safeguard against this particular threat to fair trial rights." *In re Charlotte Observer*, 882 F.2d 850, 855 (4th Cir. 1989); *see also Murphy-Brown*, 907 F.3d at 799 (noting that "[t]he law empowers trial courts to ensure fair jury trials using a number of tools," including "enlarged jury pools, *voir dire*, changes to a trial's location or schedule, [and] cautionary jury instructions").

Maryland law also provides other tools for ensuring that the dissemination of court recordings does not undermine trial fairness. As noted above, for instance, the same court rule that gives the public a right of access to court recordings also

authorizes judges to redact sensitive portions of those recordings and—if necessary—withhold entire recordings in individual cases. *See* Md. Rule 16-504(g), (h)(1)(C), (i)(1). Those provisions alone illustrate § 1-201's needless breadth.

At the same time, § 1-201 is also too *narrow* to serve Defendants' stated goals. Indeed, even under Defendants' (erroneous) view that media coverage poses a grave threat to trial fairness, the ban on disseminating court recordings fails to meaningfully address that threat. After all, the statute does nothing to stop people from reporting on pending criminal proceedings; it merely bars them from using actual recordings of those proceedings when they do so. Defendants themselves concede that people remain free to "broadcast all of the *information* in these recordings through reports, transcripts, summaries, or reenactments." Dist. Ct. ECF No. 29 (Defendants' Reply Br.), at 1-2 (emphasis in original). A ban on broadcasting court recordings cannot be narrowly tailored if it permits people to broadcast material, including "reenactments," that closely resembles those recordings. Nor can the ban be narrowly tailored if it allows similar content to be disseminated through means other than "broadcast[ing]." *Cf. Daily Mail*, 443 U.S. at 104-05 (holding that a statute criminalizing the publication of juvenile offenders' names "does not satisfy constitutional requirements" because it "does not restrict the electronic media or any form of publication, except 'newspapers,' from printing the names").

The statute is under-inclusive in another key respect: it is limited to proceedings "held in *trial* court." Md. Code, Crim. Proc. § 1-201(a)(1) (emphasis added). The

statute does nothing to prevent the broadcast of *appellate* proceedings, despite the obvious subject-matter overlap between appellate arguments and trial-court arguments. It is not at all clear why the broadcast of a trial-court hearing on a purely legal issue (which § 1-201 prohibits) would prejudice the accused any more than an appellate argument on the same issue (which § 1-201 permits). The fact that appellate arguments typically occur after a verdict has been rendered hardly eliminates the risk of prejudice: after all, the most common remedy sought in criminal appeals is a *new trial*. Thus, whatever risks of prejudice might arise from the broadcast of a pretrial hearing (in a case that may or may not go to trial) would also arise from the broadcast of an appellate argument (in a case that may or may not be remanded for a new trial).[8]

A recent example illustrates the under-inclusiveness of § 1-201's exclusive focus on trial-court proceedings. In 2018, the Maryland Court of Appeals agreed to review a lower court's decision granting a new trial to the defendant in a high-profile murder case, *State v. Syed*, 460 Md. 3 (2018), which had garnered national attention. The press was (and remains) barred from broadcasting any recordings from the trial-court proceedings related to that appeal. *See* JA 19 & n.6 (noting that court officials nearly held a podcaster in contempt for airing trial-court audio in *Syed*). Yet, when the case reached the Court of Appeals, the court live-streamed the oral argument on its *own*

[8] The same is true of appellate arguments in cases where prosecutors seek review of pretrial orders suppressing evidence or dismissing indictments. *See* Md. Code, Cts. & Jud. Proc. § 12-302(c) (listing interlocutory orders that prosecutors may appeal).

*website* and then posted a recording of the argument online afterwards (as it does in every case). *See* MD. COURT OF APPEALS, *Webcast Archive, 2018 Term*, https://perma.cc/YTL4-QNMQ (last visited Mar. 18, 2020) (select link for "State of Maryland v. Adnan Syed"). Section 1-201 did nothing to prevent the broadcast of that appeal—despite the high-profile nature of the case and despite the possibility that the case would be remanded for a new trial. The statute's failure to prevent that broadcast shows just how ill-suited it is to protect against the harms it was ostensibly crafted to prevent.[9]

Finally, the distinctiveness of Maryland's regime further suggests that it is not narrowly tailored. As noted above, Maryland appears to be the only jurisdiction to distribute recordings of its court proceedings to the public while, at the same time, *criminalizing* the public's further dissemination of those recordings.[10] *See* Addendum B.

---

[9] The subsequent history of the *Syed* case only further illustrates § 1-201's tenuous connection to "ensuring fair trials for the accused." JA 86. The Court of Appeals eventually held that the defendant in *Syed* was not entitled to a new trial, effectively ending the case. 463 Md. 60, 105 (2019). Yet, that ruling did not stop Judge Pierson from sending a cease-and-desist letter to HBO two weeks later—again, *after* the Court of Appeals held that there would be no new trial—directing the network to stop airing a documentary featuring trial footage from the case (from two decades earlier). *See* JA 53 ("In compliance with [§ 1-201], HBO should immediately cease any broadcasting of Maryland criminal trials."). Whatever purpose that letter served, it is difficult to see how it advanced the defendant's interest in a fair trial.

[10] Although § 1-201 does not specify whether violations are punishable by civil contempt or criminal contempt, Defendants have refused to disavow the use of criminal contempt to punish violations of the broadcasting ban. *See* JA 20-21, 28-29. Moreover, they acknowledged in their motion to dismiss that "[i]n both criminal and

Given that every jurisdiction in this country shares Maryland's goal of promoting trial fairness, it is unlikely that Maryland's unique regime is, in fact, narrowly tailored to that end. *Cf. Daily Mail*, 443 U.S. at 105 ("[A]ll 50 states have statutes that provide in some way for confidentiality, but only 5, including West Virginia, impose criminal penalties on nonparties for publication of the identity of the juvenile. Although every state has asserted a similar interest, all but a handful have found other ways of accomplishing the objective." (footnote omitted)); *Landmark Communications*, 435 U.S. at 841 ("While not dispositive, we note that more than 40 States having similar commissions have not found it necessary to enforce confidentiality by use of criminal sanctions against nonparticipants.").

**D. Section 1-201 is not narrowly tailored to protect any other state interests.**

The district court suggested that § 1-201 serves additional purposes beyond "ensuring fair trials." JA 86. But even assuming those additional purposes constitute state interests "of the highest order"—which is dubious—they only highlight the statute's lack of narrow tailoring.

For example, the district court stated that § 1-201 operates to "preserv[e] order and decorum in the courtroom." JA 86. That claim is hard to square with the Maryland Court of Appeals's practice of live-streaming all of its arguments online. *See*

---

civil contempt proceedings, a full range of sanctions, including incarceration, may apply." Dist. Ct. ECF No. 21-1, at 33.

*supra* part I.C. Moreover, even if it were true that *live* broadcasting inherently undermines courtroom decorum, § 1-201's perpetual prohibition on broadcasting—which continues even *after* the relevant court session has ended—would still be overbroad. As noted above, Plaintiffs here do not seek to record or broadcast any proceedings from *inside the courtroom*; rather, they seek to engage in speech *outside the courtroom*, using recordings that the court has already made public. *See* JA 15. That activity cannot undermine courtroom order or decorum in any way. If it could, then this Court's practice of posting its oral-argument recordings online after each court session would likewise threaten courtroom order and decorum. Such an argument is plainly untenable.

So, too, is the district court's suggestion that § 1-201 serves to "increase the accuracy of the essential truth-seeking function of the trial." JA 86 (citation omitted). The court asserted that § 1-201 mitigates "television's probable adverse impact on jurors, witnesses, and other trial participants." JA 86 (emphases added; citation omitted). But § 1-201 is not restricted to broadcasts of jury trials or other proceedings featuring witnesses: by its express terms, the statute prohibits broadcasts of any "hearing, motion, or argument . . . held in trial court." Md. Code, Crim. Proc. § 1-201(a)(1). As the district court itself acknowledged elsewhere in its opinion, the statute does not draw any distinctions based on what happens during the proceeding at issue. *See* JA 85 ("The ban prohibits broadcasting of *any* communicative content from criminal proceedings, whether the speech discusses criminal matters or not.").

Nor is the statute limited to "television" broadcasting. Indeed, almost all of the recordings that Plaintiffs seek to disseminate here are audio-only recordings. JA 16-17. And Maryland court officials have threatened multiple podcasters for their use of audio-only recordings. JA 19. Furthermore, to the extent that video recordings of criminal cases raise different concerns than audio recordings, court officials could address those concerns in any number of more tailored ways. For instance, they could ensure that the court's cameras do not capture the faces of any jurors, as other states do. Or they could simply refuse to provide copies of any video recordings to the public—as Rule 16-504 already allows them to do. *See* Md. Rule 16-504(h), (j) (providing that "any person" may obtain copies of audio recordings but that only certain individuals may obtain copies of video recordings). The availability of these less restrictive alternatives only further illustrates how far the statute reaches beyond the district court's stated concern.

## II. The district court improperly analyzed § 1-201 as a "time, place, and manner" restriction on speech, rather than under *Cox Broadcasting* and *Daily Mail*.

The district court acknowledged that "prohibitions on the publication of truthful information" must be justified by "a state interest of the highest order," under *Cox Broadcasting* and *Daily Mail*. JA 82 (citation and quotation marks omitted). However, the court held that this standard applies only when the government imposes a complete ban "on *any* publication of the subject information." JA 82 (emphasis in original); *see also* JA 80 ("The Supreme Court has applied this standard in cases

involving statutes that *completely* prohibited the publication of truthful information." (emphasis added)). Because the court found that § 1-201 does not impose such a ban, it held that § 1-201 was better analyzed "as a time, place, and manner regulation." JA 84. The court's reasoning fails for several reasons.

### A. The district court failed to distinguish *Cox Broadcasting* and *Daily Mail*.

The district court refused to apply the *Daily Mail* rule in this case because it concluded that § 1-201 "is not a *total* prohibition on the publication of information that is conveyed in criminal proceedings." JA 83 (emphasis added). But the court's focus on whether the statute imposes a "total prohibition" on publication misconstrues both the holding and logic of *Daily Mail* itself. Indeed, *Daily Mail* confirms that even *partial* bans on the right to publish lawfully acquired, truthful information remain subject to exacting scrutiny—not the (less rigorous) "time, place, and manner" test applied by the district court.

In *Daily Mail*, the Supreme Court struck down a West Virginia statute that made it a crime to publish the name of a defendant in any juvenile-delinquency proceeding. The statute did not impose a "total prohibition on the publication of information that is conveyed in criminal proceedings." JA 83. Rather, it prohibited publication in "any *newspaper*." 443 U.S. at 98-99 (emphasis added). The Court explicitly noted that the "statute d[id] not restrict the electronic media or any form of publication, except 'newspapers,' from printing the names." *Id.* at 104-05. Yet, the

Court did not treat the statute's under-inclusiveness as a reason to characterize the ban as a permissible "manner" regulation. To the contrary, it relied on it to explain why the "statute's approach d[id] *not* satisfy constitutional requirements." *Id.* at 104 (emphasis added). The district court's reading of *Daily Mail*, therefore, cannot be squared with the language or logic of the Court's decision in that case. *See also Florida Star*, 491 U.S. at 540 (citing under-inclusiveness of statute that prohibited publication or broadcast "in an 'instrument of mass communication'" but "d[id] not prohibit the spread by other means").

Nor can it be squared with numerous lower-court rulings applying strict scrutiny to partial bans on publication—including bans targeting broadcasters specifically. *See, e.g.*, *Firearms Policy Coal.*, 192 F. Supp. 3d at 1128 (rejecting argument "that Plaintiffs will not suffer any real harm if they are required to comply with [a ban on broadcasting publicly available footage of legislative proceedings] because they are still free to use transcripts and audio recordings of the Assembly proceedings in question"). For instance, in *KPNX Broadcasting v. Superior Court of Maricopa County*, the Arizona Supreme Court struck down a trial judge's order prohibiting a courtroom sketch artist from sharing his sketches with television broadcasters. 139 Ariz. 246, 254 (1984). Like the Supreme Court in *Daily Mail*, the court in *KPNX* held that "the sketch order was completely ineffective to protect the identities of the jury and the

fair trial rights of the accused" because it "did not prohibit the print media from publishing jury sketches." *Id.* at 252.[11]

Similarly, in *Commonwealth v. Barnes*, the Supreme Judicial Court of Massachusetts held that a local news station could not be barred from posting online its (lawfully made) audio and video recordings of certain juvenile-court proceedings. 461 Mass. 644, 646 (2012). In rejecting the government's argument that the broadcasting ban was necessary to protect the identity of a minor sexual-assault victim, the court specifically cited the fact that the "minor's identity can be readily determined" from prior reporting on the case. *Id.* at 657 n.22; *see also id.* ("Much of the identifying information other than the minor's name already has been reported in the print media."). In other words, the court construed the broadcasting ban as a prohibition on the dissemination of truthful information—thus triggering strict scrutiny—even though the ban did not impose a "total prohibition" on all forms of publication. *See id.* at 651 ("[I]f a court chooses in its discretion to allow recording,

[11] Although *KPNX* did not cite *Daily Mail* specifically, it applied the same rigorous standard, relying instead on *Cox Broadcasting* and *Nebraska Press Association*. *See* 139 Ariz. at 252 (holding that the prohibition on disseminating sketches of open-court proceedings constituted an invalid prior restraint "because that information is garnered from information placed 'in the public domain'" (quoting *Cox Broadcasting*, 420 U.S. at 469)).

the person or entity making it has the same First Amendment freedom to disseminate the information it records as any other member of the print media or public.").[12]

Even setting aside this case law, the district court's reading of *Daily Mail* and its progeny makes little logical sense. The same First Amendment principles that preclude the government from *completely* banning the publication of certain truthful, publicly available information would also preclude the government from *partially* banning the publication of that information. After all, if the government could evade the *Daily Mail* rule merely by restricting the dissemination of truthful information to certain formats, then it could simply tailor its rules to target the most effective forms of dissemination. There is no reason to believe that such a regime would cure the First Amendment concerns the Supreme Court described in *Daily Mail*, *Florida Star*, and other cases.

In any event, the district court's reasoning fails on its own terms because Maryland court officials *do* construe § 1-201 as a total ban on publication: once again, they construe the term "broadcast[ing]" to encompass the dissemination of court

---

[12] Like *KPNX*, the court in *Barnes* did not cite *Daily Mail* itself, but relied instead on similar cases—specifically, *Nebraska Press Association* and *Oklahoma Publishing Company*—to explain why strict scrutiny applied. *See* 461 Mass. at 654 ("[T]here can be no restraint on publication of the recording unless the court also determines that such a restraint is necessary to protect a compelling governmental interest and is the least restrictive reasonable method to do so.").

recordings in *any* format.[13] Although the district court suggested that § 1-201 is "not a total prohibition" because "the media remain free to publish the information they glean from attending or listening to the criminal recordings," JA 83, those secondhand accounts are not the same as actual recordings. Among other differences, recordings capture the human aspects of a proceeding—a judge's tone, a witness's hesitation, or a lawyer's inflection—that cannot be documented as effectively in written form. Recordings are also more accessible to many people, particularly those with limited literacy skills, and are free from transcription inaccuracies. Indeed, the shortcomings of written transcripts are so well known that they form the basis for entire doctrines of trial-court deference. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 386-87 (2010) ("In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service."). In sum, § 1-201 relegates people to using inferior methods of commenting on public judicial proceedings. Those methods, by their nature, cannot "convey the same information" as recordings. JA 87.

[13] As noted above, Defendants have consistently refused to clarify whether they construe § 1-201 as prohibiting people from sharing court recordings via social media, posting them online, or playing them during community meetings. In the absence of such clarity, Plaintiffs are entitled to an inference (at the pleading stage) that Defendants consider these activities to be prohibited under the statute.

### B. Section 1-201 is not a "time, place, and manner" regulation.

Instead of analyzing § 1-201 under the *Daily Mail* rule, the district court held that the statute "is properly analyzed as a time, place, and manner regulation" of speech. *See* JA 82. The court borrowed that framework from several cases upholding First Amendment challenges to Federal Rule of Criminal Procedure 53, which prohibits "the broadcasting of judicial proceedings from the courtroom." *See* JA 87-88 (citing cases). But the court's attempt to analogize § 1-201 to Rule 53—as well as its reliance on the cases upholding that rule—is misguided in several ways.

First, unlike § 1-201, Rule 53 only prohibits broadcasting "*from the courtroom*." That textual difference is critically important here because Plaintiffs are not challenging the constitutionality of § 1-201 insofar as it prohibits broadcasting *from* the courtroom. Instead, Plaintiffs' claim focuses on § 1-201's application to their activities *outside* the courtroom: specifically, their efforts to broadcast recordings that Maryland court officials have already made public. The very nature of that activity makes it impossible for Plaintiffs to engage in the kind of live broadcasting that Rule 53 targets. Plaintiffs literally cannot begin broadcasting until the relevant court session has ended and court officials have processed their request (and payment) for the recording—a process that typically takes several days.

The cases that the district court cited only highlight the gap between the conduct barred by Rule 53 (i.e., live broadcasting) and the conduct in which Plaintiffs seek to engage (i.e., broadcasting recordings that the court itself has made public).

Every case that the district court cited involved someone seeking to challenge Rule 53's prohibition on First Amendment conduct inside the courtroom.[14] None addresses the broadcast of recordings that have already been made public. What's more, one of the cases the district court cited suggests that Rule 53 would in fact permit the dissemination of a (lawfully made) court recording to the news media. *See United States v. Kerley*, 753 F.2d 617, 621-22 (7th Cir. 1985) ("[T]he record indicates that the trial court will permit [the defendant] to record the proceedings on audiotape. Thus, [the defendant]'s concern about the accuracy of news-reporting should be met by the audiotapes he will be permitted to make."). In short, the cases cited by the district court simply reaffirm the importance of Rule 53's "from the courtroom" limitation—a limitation not challenged in this suit.

That limitation is not inconsequential. Rather, the entire reason that courts treat Rule 53 as a "time, place, and manner" regulation is that it limits the rule's coverage to a specific "place"—the courtroom. Maryland's broadcasting ban, in contrast, is not constrained by the time, place, or manner of the broadcasts that it prohibits. To the contrary, it prohibits people from broadcasting court recordings at

---

[14] Although the district court cited one case upholding a local rule that was "phrased . . . differently" from Rule 53, that rule simply extended Rule 53's broadcasting prohibition to reach all courthouse "environs." JA 88 (citing *United States v. Hastings*, 695 F.2d 1278, 1279 n.4 (11th Cir. 1983)).

*any* time, in *any* place, and in *any* manner.[15] *See supra* part I.C (discussing § 1-201's sweeping breadth); JA 20-22 (describing court officials' repeated failure to clarify the scope of § 1-201). An individual does not even need to set foot inside the courthouse to violate § 1-201; under Defendants' reading of the statute, a person could incur liability simply by broadcasting a recording that was obtained by a colleague, provided to the press, or posted online by someone else. The statute, in other words, is no more focused on the "time, place, and manner" of speech than any of the publication or broadcast restrictions that courts have struck down under *Daily Mail*.

In any event, the district court's effort to equate § 1-201 with Rule 53 conflicts with the widely held view that Rule 53 prohibits only *live* broadcasts of criminal proceedings. *See, e.g.*, *Kerley*, 753 F.2d at 622 (finding Rule 53 inapplicable to activities occurring "outside of the courtroom" and that "would have no apparent effect on the proceedings themselves"); *United States v. Berger*, 990 F. Supp. 1054, 1057 (C.D. Ill. 1998) (holding that the release of deposition videotape previously played during a criminal trial did not violate Rule 53 because "there was no camera or satellite feed emanating *from the courtroom*" and no one "broadcast *live* . . . within the courtroom"

[15] To the extent that the district court construed the broadcasting ban as regulating the "manner" of speech, then it should have also construed the statute as a content-based regulation because the restricted "manner" of speech (i.e., "broadcast[ing]") cannot be defined without respect to the speech's content (i.e., "any criminal matter, including a trial, hearing, motion, or argument"). A defining characteristic of reasonable "time, place, and manner" regulations is that they draw no distinctions among the types of information to be conveyed.

(emphases added)). And it also defies common sense. Lawyers and journalists routinely post and share links to (publicly available) oral-argument recordings in federal criminal appeals. *See, e.g.*, Orin Kerr (@OrinKerr), TWITTER (Oct. 27, 2017, 10:21 AM), https://perma.cc/JYL7-W7W9 (providing a link to an audio recording of an oral argument in a Fourth Circuit criminal appeal). Nobody would seriously suggest that such activity violates Rule 53.

### C. Even if § 1-201 could be construed as a "time, place, and manner" restriction, it would still violate the First Amendment.

Even if the district court's decision to analyze § 1-201 as a "time, place, and manner" regulation were legally sound—and it was not—the statute still would not pass constitutional muster. A "regulation of the time, place, and manner of speech is generally valid if it furthers a substantial government interest, is narrowly tailored to further that interest, and leaves open ample alternative channels of communication." *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 609 (4th Cir. 2001). As explained above, *supra* part I.C, § 1-201 is not narrowly tailored because it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted; alteration in original). Nor does the statute leave open ample alternative channels of communication.

The Supreme Court has often recognized that speech restrictions that target uniquely effective methods of sharing information do not leave open ample

alternative channels of communication. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (striking down town ordinance banning residential signs because "adequate substitutes [did not] exist for the important medium of speech that [the town] has closed off"); *id.* at 54 (recognizing the protected status of "unique and important" methods of communication); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (invalidating a state statute that barred sex offenders from accessing social-media websites because the statute deprived them of one of "the most powerful mechanisms available to a private citizen to make his or her voice heard").

The Court's decision in *Linmark Associates, Inc. v. Willingboro Township*, 431 U.S. 85 (1977), illustrates this point well. In *Linmark*, the Court struck down an ordinance that prohibited the residents of a town from posting "For Sale" signs in front of their homes. The town adopted the ordinance in an effort to preserve residential stability by masking the visible rate of turnover among its residents, particularly its white homeowners. *Id.* at 86. Although the Court acknowledged that the town's goal was valid, *id.* at 94, it nevertheless held that the ordinance violated the First Amendment because it "restrict[ed] the free flow of truthful information," *id.* at 95. The Court held, in particular, that the ban on "For Sale" signs failed to leave open ample alternative channels for people to communicate that they were selling their homes. *See id.* at 93. As the Court reasoned, all of the "options to which sellers realistically are relegated" would have "involve[d] more cost and less autonomy," been "less likely to

reach persons not deliberately seeking [the] information," and relied on "less effective media for communicating the message." *Id.*

The broadcasting ban has the same adverse impact on the "free flow of truthful information," but in an even more important arena: public discourse surrounding Maryland's justice system. Furthermore, just like the ordinance in *Linmark*, the ban stifles people's ability to communicate their desired messages as effectively or as widely. As several courts have recognized, "[r]ecordings . . . facilitate discussion because of the ease in which they can be widely distributed via different forms of media." *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *see also ACLU v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) ("[A]udio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public."). These features, along with the "self-authenticating character" of recordings, make "it highly unlikely that other methods [of speech] could be considered reasonably adequate substitutes." *Alvarez*, 679 F.3d at 607. Because § 1-201 targets that specific method of speech, it fails to leave open the alternative channels of communication required by the First Amendment.

## III. The district court's reliance on *Warner Communications* is misplaced.

In addition to holding that § 1-201 was a valid "time, place, and manner" regulation, the district court held that Plaintiffs' First Amendment claim was foreclosed by the Supreme Court's decision in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978). *See* JA 84 ("Plaintiffs similarly argue that they have a First

Amendment right to broadcast the recordings in their possession to the public. *Warner Communications* clearly forecloses this right."). The district court never explained how *Warner Communications* fit into its broader "time, place, and manner" analysis. But, regardless, *Warner Communications* has no bearing on the right Plaintiffs have asserted here.

*Warner Communications* involved the press's efforts to obtain copies of the infamous Nixon White House tapes, which had been played as evidence during the trial of four of the Watergate conspirators. The Supreme Court held that the press did not have a First Amendment right to obtain copies of the tapes. 435 U.S. at 608-10. The Court reasoned that because members of the press had been permitted to attend the trial and receive transcripts of the tapes, their right of access to the trial had not been infringed. *See id.* In reaching that conclusion, the Court rejected the press's claim that they were entitled to copies of the White House tapes under *Cox Broadcasting*. *See id.* at 608-09. The Court explained that, unlike in *Cox Broadcasting*, "[t]here simply were no restrictions upon press access to, or publication of any information in the public domain" during the Watergate trial. *Id.* at 609.

The district court cited this language as support for its conclusion that Plaintiffs do not have a First Amendment right to broadcast their court recordings. But the very language the district court cited illustrates why *Warner Communications* is inapposite here—namely, because the press in that case were not prevented from accessing (or disseminating) materials already "in the *public domain*." 435 U.S. at 609

(emphasis added).[16] The Court's opinion in *Warner Communications* made this point explicitly. As it stated later in the same paragraph: "the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying." *Id.* at 609 (emphasis in original). Thus, the Court's own opinion distinguishes the present situation—in which the public has already obtained physical access to the relevant records—from the situation it considered in *Warner Communications*.

Put differently, *Warner Communications* turned on the right of *access* to public records in the first instance, while this case turns on the right to *disseminate* them after access has been granted. Although the two rights are related, the government's authority to restrict the latter is much narrower. That is precisely why courts are so reluctant to impose restrictions on the dissemination of court records once they have been made public—even if they were made public in error. *See, e.g.*, *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("The genie is out of the bottle,

[16] This is not an idle distinction: the Supreme Court has long recognized—in a variety of different contexts—the importance of protecting information in the public domain. *See, e.g.*, *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484 (1974) (reiterating, in the trade-secret context, that "matter once in the public domain must remain in the public domain"); *Graham v. John Deere Co.*, 383 U.S. 1, 6 (1966) ("Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available.").

albeit because of what we consider to be the district court's error. We have not the means to put the genie back."); *see also In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990) ("In appropriate circumstances a court might well issue curative orders protecting the business and the secrecy of the grand jury. On the present record, however, 'the cat is out of the bag.'" (citation omitted)).

The district court's decision thus elides the important distinction between the public's right of access to court records (which is governed by *Warner Communications*) and the public's right to disseminate them (which is governed by *Daily Mail*).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and Plaintiffs' First Amendment claims should be reinstated.

Respectfully submitted,

*/s/ Nicolas Y. Riley*

NICOLAS Y. RILEY
DANIEL B. RICE
INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: 202-662-4048
Fax: 202-662-9248
nr537@georgetown.edu
dbr32@georgetown.edu

ADAM HOLOFCENER
MARYLAND VOLUNTEER LAWYERS FOR THE ARTS
120 W. North Ave., Suite 305A
Baltimore, MD 21201
Tel.: 410-752-1633
adam@mdvla.org

MARCH 23, 2020

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 11,925 words, excluding the parts of the document exempted by Rule 32(f), and was prepared in fourteen-point Garamond font, a proportionally spaced typeface, using Microsoft Word.

*/s/ Nicolas Y. Riley*
NICOLAS Y. RILEY
*Counsel for Plaintiff-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Nicolas Y. Riley*
NICOLAS Y. RILEY
*Counsel for Plaintiff-Appellants*

## ADDENDUM A:

## PERTINENT MARYLAND STATUTES & RULES

# TABLE OF CONTENTS

Maryland Code, Criminal Procedure § 1-201 .................................................................. A1

Maryland Rule 16-504 .............................................................................................. A2

**Maryland Code, Criminal Procedure § 1-201.**

**RECORDING OR BROADCASTING CRIMINAL PROCEEDINGS PROHIBITED.**

*Application to trials, hearings, motions, or arguments*

**(a)** (1) Except as provided in subsection (b) of this section, a person may not record or broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury.

(2) This prohibition applies to the use of television, radio, and photographic or recording equipment.

*Electronic or photographic equipment approved by court*

**(b)** Subsection (a) of this section does not apply to the use of electronic or photographic equipment approved by the court:

(1) to take the testimony of a child victim under § 11-303 of this article; or

(2) to perpetuate a court record.

*Contempt of court for violations of section*

**(c)** A person who violates this section may be held in contempt of court.

**Maryland Rule 16-504.**

**ELECTRONIC RECORDING OF CIRCUIT COURT PROCEEDINGS.**

**(a) Control of and Direct Access to Electronic Recordings.**

(1) Under Control of Court. Electronic recordings made pursuant to Rule 16-503 and this Rule are under the control of the court.

(2) Restricted Access or Possession. No person other than a duly authorized official or employee of the circuit court shall have direct access to or possession of an official electronic recording.

**(b) Filing of Recordings.** Audio and audio-video recordings shall be maintained by the court in accordance with standards specified in an administrative order of the Chief Judge of the Court of Appeals.

**(c) Court Reporters.** Regulations and standards adopted by the Chief Judge of the Court of Appeals under Rule 16-505 (a) apply with respect to court reporters employed in or designated by a circuit court.

**(d) Presence of Court Reporters Not Necessary.** Unless otherwise ordered by the court with the approval of the administrative judge if circuit court proceedings are recorded by audio or audio-video recording, which is otherwise effectively monitored, a court reporter need not be present in the courtroom.

**(e) Identification Label.** Whenever proceedings are recorded by electronic audio or audio-video means, the clerk or other designee of the court shall affix to each electronic audio or audio-video recording a label containing the following information:

(1) the name of the court;

(2) the docket reference of each proceeding included on the recording;

(3) the date on which each proceeding was recorded; and

(4) any other identifying letters, marks, or numbers necessary to identify each proceeding recorded.

**(f) Information Required to be Kept.**

(1) Duty to Keep. The clerk or other designee of the court shall keep the following items:

(A) a proceeding log identifying (i) each proceeding recorded on an audio or audio-video recording, (ii) the time the proceeding

commenced, (iii) the time of each recess, and (iv) the time the proceeding concluded;

(B) an exhibit list;

(C) a testimonial log listing (i) the recording references for the beginning and end of each witness's testimony and (ii) each portion of the audio or audio-video recording that has been safeguarded pursuant to section (g) of this Rule.

(2) Location of Exhibit List and Logs. The exhibit list shall be kept in the court file. The proceeding and testimonial logs shall be kept with the audio or audio-video recording.

**(g) Safeguarding Confidential Portions of Proceeding.** If a portion of a proceeding involves placing on the record matters that, on motion, the court finds should and lawfully may be shielded from public access and inspection, the court shall direct that appropriate safeguards be placed on that portion of the recording. For audio and audio-video recordings, the clerk or other designee shall create a log listing the recording references for the beginning and end of the safeguarded portions of the recording.

**(h) Right to Obtain Copy of Audio Recording.**

(1) Generally. Except (A) for proceedings closed pursuant to law, (B) as otherwise provided in this Rule, or (C) as ordered by the court, the authorized custodian of an audio recording shall make a copy of the audio recording or, if practicable, the audio portion of an audio-video recording, available to any person upon written request and, unless waived by the court, upon payment of the reasonable costs of making the copy.

(2) Redacted Portions of Recording. Unless otherwise ordered by the County Administrative Judge, the custodian of the recording shall assure that all portions of the recording that the court has directed be safeguarded pursuant to section (g) of this Rule are redacted from any copy of a recording made for a person under subsection (h)(1) of this Rule. Delivery of the copy may be delayed for a period reasonably required to accomplish the redaction.

(3) Exceptions. Upon written request and subject to the conditions in section (h) of this Rule, the custodian shall make available to the following persons a copy of the audio recording or, if practicable, the audio portion of an audio-video recording of proceedings that were closed pursuant to law or from which safeguarded portions have not been redacted:

(A) the Chief Judge of the Court of Appeals;

(B) the County Administrative Judge;

(C) the Circuit Administrative Judge having supervisory authority over the court;

(D) the presiding judge in the case;

(E) the Commission on Judicial Disabilities or, at its direction, Investigative Counsel;

(F) Bar Counsel;

(G) unless otherwise ordered by the court, a party to the proceeding or the attorney for a party;

(H) a stenographer or transcription service designated by the court for the purpose of preparing an official transcript of the proceeding, provided that (i) the transcript of unredacted safeguarded portions of a proceeding, when filed with the court, shall be placed under seal or otherwise shielded by order of court, and (ii) no transcript of a proceeding closed pursuant to law or containing unredacted safeguarded portions shall be prepared for or delivered to any person not listed in subsection (h)(3) of this Rule; and

(I) any other person authorized by the County Administrative Judge.

**(i) Right to Listen to and View Audio-video Recording.**

(1) Generally. Except for proceedings closed pursuant to law or as otherwise provided in this Rule or ordered by the Court, the authorized custodian of an audio-video recording, upon written request from any person, shall permit the person to listen to and view the recording at a time and place designated by the court, under the supervision of the custodian or other designated court official or employee.

*Committee note: If space is limited and there are multiple requests, the custodian may require several persons to listen to and view the recording at the same time or accommodate the requests in the order they were received.*

(2) Safeguarded Portions of Recording. Unless otherwise ordered by the County Administrative Judge, the custodian of the recording shall assure that all portions of the recording that the court directed to be safeguarded pursuant to section (g) of this Rule are not available for listening or viewing. Access to the recording may be delayed for a period reasonably necessary to accomplish the safeguarding.

(3) Copying Prohibited. A person listening to and viewing the recording may not make a copy of it or have in his or her possession any device that, by itself or in combination with any other device, can make a copy. The custodian or other designated court official or employee shall take reasonable steps to enforce this prohibition, and any willful violation of the prohibition may be punished as a contempt.

**(j) Right to Obtain Copy of Audio-video Recording.**

(1) Who May Obtain Copy. Upon written request and subject to the conditions in this section, the custodian shall make available to the following persons a copy of the audio-video recording, including a recording of proceedings that were closed pursuant to law or from which safeguarded portions have not been redacted:

(A) the Chief Judge of the Court of Appeals;

(B) the County Administrative Judge;

(C) the Circuit Administrative Judge having supervisory authority over the court;

(D) the presiding judge in the case;

(E) the Commission on Judicial Disabilities or, at its direction, Investigative Counsel;

(F) Bar Counsel;

(G) unless otherwise ordered by the court, a party to the proceeding or the attorney for a party;

(H) a stenographer or transcription service designated by the court for the purpose of preparing an official transcript of the proceeding, provided that, (i) if the recording is of a proceeding closed pursuant to law or from which safeguarded portions have not been redacted, the transcript, when filed with the court, shall be placed under seal or otherwise shielded by order of the court, and (ii) no transcript of a proceeding closed pursuant to law or containing unredacted safeguarded portions shall be prepared for or delivered to any person not listed in subsection (j)(1) of this Rule;

(I) the Court of Appeals or the Court of Special Appeals pursuant to Rule 8-415 (c); and

(J) any other person authorized by the County Administrative Judge.

(2) Restrictions on Use. Unless authorized by an order of court, a person who receives a copy of an electronic recording under this section shall not:

(A) make or cause to be made any additional copy of the recording; or

(B) except for a non-sequestered witness or an agent, employee, or consultant of the party or attorney, give or electronically transmit the recording to any person not entitled to it under subsection (j)(1) of this Rule.

(3) Violation of Restriction on Use. A willful violation of subsection (j)(2) of this Rule may be punished as a contempt.

## ADDENDUM B:

## PUBLIC ACCESS TO TRIAL-COURT RECORDINGS IN OTHER STATES

## ADDENDUM B

This addendum catalogues a non-exhaustive list of jurisdictions in which members of the public or the press can access copies of recordings of criminal proceedings held in state trial courts. (Where public access is governed by a statewide rule or statute, a citation to the relevant statute or rule is provided; where public access is simply governed by local practice, a link to the relevant guidance document or recording-request form is provided.) Because this list is merely intended to be illustrative, no more than four jurisdictions are listed for any single state.

### ALASKA

- All counties (all courts), Ala. Admin. R. 9(d), 35(a), 37.5

### ARIZONA

- Maricopa County (Superior Court), https://perma.cc/77V6-NAWR
- Pima County (Justice Court), https://perma.cc/SX26-8YMC

### CALIFORNIA

- Contra Costa County (Superior Court), https://perma.cc/XX27-V34P
- Los Angeles County (Superior Court), https://perma.cc/26QU-YC9V
- Orange County (Superior Court), https://perma.cc/2MR6-UB9G
- Santa Clara County (Superior Court), https://perma.cc/2S77-EB3A

### COLORADO

- Various counties (District Courts), https://perma.cc/FE4U-UWNN

### CONNECTICUT

- All counties (Superior Courts), https://perma.cc/H5A3-8EC9

### HAWAII

- Maui County (Circuit & District Courts), https://perma.cc/7SZW-DVWA

**IDAHO**

- Ada County (District Court), https://perma.cc/8YV6-NYJ7
- Canyon County (District Court), https://perma.cc/TZ22-6QY7

**KENTUCKY**

- Jefferson County (Circuit & District Courts), https://perma.cc/2RAC-SFH3

**OREGON**

- Clackamas County (Circuit Court), https://perma.cc/6JLN-ME56
- Marion County (Circuit Court), https://perma.cc/59NR-WKRT
- Deschutes County (Circuit Court), https://perma.cc/QHU4-GG24
- Washington County (Circuit Court), https://perma.cc/5W8E-UATN

**MAINE**

- All counties (all trial courts), https://perma.cc/2W4X-9CEV

**MASSACHUSETTS**

- All counties (Superior Courts), https://perma.cc/5BMS-B68F

**MICHIGAN**

- Kalamazoo County (Circuit Court), https://perma.cc/3UUB-5WUF
- Washtenaw County (Trial Court), https://perma.cc/6L75-5LW7

**NEBRASKA**

- All counties (County Courts), Neb. Ct. R. § 6-1405

**NEVADA**

- Henderson County (Municipal Court), https://perma.cc/28GT-AZA8

**NEW HAMPSHIRE**

- All counties (Superior Courts), N.H. R. Crim. P. 53(a)

**NEW JERSEY**

- All counties with recording capacity (all courts), https://perma.cc/JT8U-LGK5

**NORTH CAROLINA**

- Various counties (District Courts), https://perma.cc/U8SH-RM5P

**NORTH DAKOTA**

- All counties with recording capacity (District Courts), N.D. Sup. Ct. Admin. R. 39 & 40

**OHIO**

- Clermont County (Court of Common Pleas), https://perma.cc/65KY-SF2F
- Fairfield County (Court of Common Pleas), https://perma.cc/PPU3-52MJ

**RHODE ISLAND**

- All counties (District Courts), https://perma.cc/2BTZ-NFMG

**UTAH**

- All counties (District Courts), https://perma.cc/W5RF-EUKV

**VERMONT**

- All counties (all courts), Vt. R. Crim. P. 53.1(f)

**WASHINGTON**

- King County (Superior Court), https://perma.cc/4ZRB-EBXW
- Pierce County (District Court), https://perma.cc/QXS2-U5TT
- Spokane County (Superior Court), https://perma.cc/7X8A-A6QL

- Yakima County (Superior Court), https://perma.cc/83FZ-RHYP

**WISCONSIN**

- All counties with recording capacity (Circuit Courts), Wis. S. Ct. R. 71.03(6)